Filed 1/26/21  P. v. Lopez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JUAN FRANCISCO LOPEZ,<br><br>    Defendant and Appellant. | F077400<br><br>(Super. Ct. No. BF163485A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Janice M. Lagerlof, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Paul E. O'Connor, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury found appellant Juan Francisco Lopez guilty of the murder (Pen Code,[1] § 187, subd. (a)) of Silvestre Soto.  The jury fixed the murder at first degree, finding true allegations that appellant committed the crime with premeditation and deliberation and

---

[1]    All further undesignated statutory references are to the Penal Code.

while lying in wait (§ 189). The jury found true allegations that appellant personally and intentionally discharged a firearm causing death in the commission of the crime (§ 12022.53, subd. (d)), and that appellant committed the murder for financial gain (§ 190.2, subd. (a)(1)) and while lying in wait (§ 190.2, subd. (a)(15)).

On appeal, appellant contends his conviction must be reversed because (1) his California constitutional rights were violated by the collection of DNA evidence following a 2012 arrest for charges that were later dismissed, which was retained and used to connect appellant to the crime scene; (2) his Sixth and Fourteenth Amendment rights were violated when the court instructed the jury with CALCRIM No. 373 on uncharged participants without instructing the jury the instruction did not apply to testifying witnesses; and (3) his Sixth and Fourteenth Amendment rights were violated when the court allegedly failed to properly respond to a jury question. We affirm.

## FACTS

Soto was a mechanic who owned a tow truck. Soto's wife, Olga Galvan,[2] testified that on the evening of March 19, 2014, she and Soto were sitting in their backyard. At around 8:00 or 8:30 p.m., she heard someone arrive and yell "Silvestre" from the driveway. Soto went out to the driveway to talk to the person for about four to five minutes. When Soto went back to the backyard, he told Olga he was going to pick up a car with his tow truck and would be right back.

At around 9:15 or 9:30 p.m., Soto had not returned home. Olga was worried and called Soto about three times. Olga received a text message from Soto's number that said, "I cannot speak right now. I'll call you back later." Olga said this did not seem like a text message Soto would send. They did not text; he usually would just answer her calls.

---

[2]    Both Olga Galvan and Lisandro Galvan testified at trial and are referred to herein by their first names to avoid confusion. No disrespect is intended.

2.

On March 20, 2014, the body of Soto Silvestre was found in an orchard. Soto had sustained multiple shotgun rounds to the face. His body was lying behind his tow truck with shoe prints situated around Soto's body as if someone were straddling him. There were several spent 12-gauge shotgun shells around Soto's body. Soto's pants pockets were pulled out as if someone went through his pockets, and his wallet was not found on his person. There was a pair of black latex gloves lying in between Soto's legs, which were sent to the Kern County Regional Crime Lab for forensic analysis. The autopsy revealed the cause of death was multiple shotgun wounds. A man who lived on the orchard property heard two gunshots between 8:30 p.m. and 9:00 p.m. on March 19, 2014.

The month following Soto's death, the police were dispatched to a residence regarding a gunshot being heard. A shotgun was seized which was later determined to be the gun used in the homicide of Soto. The individual who was in possession of the gun, Ignacio Garcia, was renting his residence from Alberto Gonzalez. Garcia purchased the gun from someone he had never seen before who was passing by his residence on foot. The person was not appellant.

Gonzalez was the husband of Soto's wife's cousin. According to Soto's son, Lisandro Galvan, Gonzalez and Soto always had a rivalry between them that stemmed from a confrontation between Gonzalez and Soto's younger brother. Lisandro said it was rare that Soto would tow a vehicle late at night unless he was doing it for a friend; Soto would not have towed a vehicle for Gonzalez or anyone associated with Gonzalez.

Gonzalez testified at trial pursuant to an immunity agreement. Gonzalez owns Beto's Automotive and tows vehicles. Gonzalez owns several guns, including shotguns. Gonzalez testified he knew Soto because Soto's family rented a house from him 30 years prior. Gonzalez denied having an argument with Soto or Soto's younger brother. Gonzalez would see Soto periodically but would "never" speak to him.

3.

Gonzalez had known appellant for many years.  Appellant did work for Gonzalez at his shop like bringing parts into the wrecking yard.  Appellant would sometimes bring Gonzalez plywood sheets.  Gonzalez told police in 2015, a cell phone that was registered to Gonzalez, but was not his primary cell phone, ending in numbers 2451 (phone 2451), was exclusively used by appellant.  At trial, however, he testified anyone at his shop had access to the phone.

GPS data from phone 2451 showed that on March 19, 2014, between 6:00 p.m. and 6:45 p.m., there were several calls between phone 2451 and Gonzalez's primary cell phone.  From about 8:00 p.m. to 8:30 p.m., the phone was moving from the area of Soto's residence toward the murder scene.  At 8:43 p.m., phone 2451 called Gonzalez's primary cell phone and there were several shorter calls between the two phones shortly after.

That night, Victoria Guzman, who was dating Lina Castro, appellant's wife's brother, received a text message from phone 2451 that said, "Hey, this is Juan.  In a bit I'm gonna need you to act like my wife.  Please answer me when I do."  There were two more messages from phone 2451 shortly thereafter:  "K.  Just that you got tired of waiting and got a ride from a coworker" and "K.  Thanks.  This is important." Immediately after receiving these texts, Guzman got a phone call from an unknown number but no one spoke.  She could hear voices but could not identify who it was or what was being said.  She thought it was appellant because of the texts.  It was later determined the phone call was from Soto's cell phone.  Phone records show there were several texts between phone 2451 and Guzman between 8:14 p.m. and 8:23 p.m. and then two calls from Soto's phone to Guzman:  one at 8:28 p.m. and one at 8:36 p.m.

Guzman spoke to the police in July 2014.  She told them approximately three days after she got the strange phone call, appellant told her Gonzalez hired him to kill someone.  Appellant had a "fat stack" of money and said he got it and a white Chevrolet Cavalier for killing the person.  At trial, Guzman testified she did not recall telling the police that.  A wiretap intercept of a phone call between Guzman and another unknown

4.

individual recorded her telling the other person that "Juan killed somebody." She told the other person that appellant "calls my fuckin' cell phone from the dead guy's phone right after he did it and that's how I've been tied into this shit for a minute." She said appellant was "bragging about killing this dude."

In July 2014, a friend of appellant's, Robert Hernandez, spoke to the police and told them that appellant said he got hired to do a job and that "the guy is no longer here." Appellant appeared to be boasting about it, like he was proud. Appellant told Hernandez he got $5,000 or $6,000 and a car for doing the job. Appellant suggested to Hernandez that he killed someone even though he did not use those exact words. Appellant said he went into the orchard with "this guy" and that a shot was involved. Appellant did not tell Hernandez how he got the guy to go out there with him but that he was in the tow truck with the victim. Appellant said he took the victim's wallet and cell phone. Hernandez told the police he was scared for himself and his family because he did not know what appellant was capable of. Hernandez requested to be anonymous because "I'm really frightened of this man." Appellant told Hernandez that "[i]f anybody snitches, that's the end of their life." At trial, Hernandez testified he did not remember anything he told the police.

In July 2014, a Chevrolet Cavalier registered to appellant was located in a towing yard. The purchase date of the vehicle was listed on the registration as April 3, 2014. A cell phone from the center console of the vehicle had made several calls to and from Gonzalez and Guzman between April and June 2014.

After Gonzalez spoke to law enforcement, he texted appellant saying, "The police came to the shop and asked for you," and asked appellant to call him. At some point Gonzalez called appellant and the phone call was intercepted by wiretap. In the phone call, appellant answered and told Gonzalez he was going to call him but that he was "hiding because of this shit that's going on." Gonzalez told appellant the police were

looking for him; when the police asked Gonzalez for appellant's phone number, he gave the police an old number. Gonzalez told appellant to be "alert" and "very careful."

Shortly after the call, appellant's brother called Gonzalez and asked him for money so that "[appellant] can leave, so that he can get out of here." Gonzalez said he would help and told appellant's brother he would give him $300 so that "[appellant] gets a bus." Gonzalez did give appellant's brother the money to help appellant.

DNA collected from the gloves found at the scene were analyzed and compared through the Combined DNA Index System (CODIS). In December 2015, the police received a match to appellant on one of the gloves.

A warrant was subsequently issued for appellant's arrest and, in March 2016, he was arrested out of county. Appellant spoke to police for several hours but never admitted involvement in Soto's murder. Appellant said he had borrowed a cell phone from Gonzalez, and the last time he did so was "at least two years" before the interview.

Among the defense's evidence was testimony from Guzman's boyfriend from the time of the murder and appellant's brother-in-law, Lino Castro. Castro was interviewed by the police in July 2014. He told the police that Guzman thought appellant was involved because she noticed he had a car when he previously did not have one and he had a lot of money on him. Castro said appellant has not told him about committing a murder but that Guzman would not lie about something like that. Castro said Guzman had not told him that appellant told her Gonzalez gave him a car and some money to kill someone; he thought Guzman just made an assumption about where he got the car and the money.

The prosecutor's theory was appellant shot and killed Soto at the direction of Gonzalez in exchange for money and a vehicle.

Defense counsel argued the evidence placing appellant at the murder scene was circumstantial. He suggested the gloves found at the scene with appellant's DNA were planted by Gonzalez. Defense counsel argued "this was [Gonzalez's] murder." Defense

counsel pointed out Guzman appeared to be involved too and the phone records admitted into evidence revealed several calls between she and Gonzalez.

## DISCUSSION

**I. Alleged Violation of Appellant's Right Against Unreasonable Search and Seizure and to Privacy Under the California Constitution**

### A. *Relevant Background*

Under California's "DNA and Forensic Identification Database and Data Bank Act of 1998, as amended" (DNA Act) (§ 295), any person arrested for or charged with a felony offense shall provide, among other identification, information such as fingerprints and buccal swab samples. (§ 296, subd. (a)(2)(C).) DNA profiles created from these samples are uploaded to available state and national DNA and forensic identification data banks and databases. (§ 297, subd. (b).)

The DNA Act contains an expungement provision for those who (1) have no past or present offense or pending charge which qualifies that person for inclusion within the state's database and (2) there otherwise is no legal basis for retaining the sample or profile. (§ 299, subd. (a).) Of those who may request to have their DNA sample destroyed and database profile expunged include arrestees who have given a DNA sample under the DNA Act and whose charges have been dismissed prior to adjudication by a trier of fact. (§ 299, subd. (b)(1).) The arrestee may make a written request to have his or her specimen and sample destroyed and searchable database profile expunged from the data bank program. (§ 299, subd. (b).) The court has discretion to grant or deny the request for expungement, and the denial is a nonappealable order. (§ 299, subd. (c)(1).)

In the present case, the match in the CODIS database to appellant's DNA on the gloves from the crime scene was a result of a DNA sample appellant provided at booking for a 2012 felony arrest pursuant to section 296. Charges were filed against appellant in relation to that arrest but were subsequently dismissed, and his DNA profile remained

7.

uploaded in CODIS. There is no evidence on the record appellant made any effort to get his sample or profile expunged.

Appellant moved to suppress the DNA evidence taken from him in 2012 following his arrest, as well as the "fruits" of the collection of such evidence: the resulting CODIS hit generated in the present case in December 2015; any and all statements appellant made to law enforcement in March 2016; a DNA swab taken from appellant in April 2016 as part of the investigation for the present case; and the results of the subsequent DNA test. Appellant argued in his motion that his arrest was not supported by probable cause as required by the United States Supreme Court case, *Maryland v. King* (2013) 569 U.S. 435 (*King*), and the DNA Act violates article I, section 13 of the California Constitution.

At the hearing on the motion, Kern County Deputy Sheriff Dustin Silva testified that on May 8, 2012, he was dispatched to a construction site due to a report of people trespassing and possibly trying to steal construction materials. When Silva arrived, he saw an opening in the gate with broken chain links lying on the ground in the dirt. He could not see anyone but heard people running from the property. Silva entered the construction site and observed a white van parked on the premises which was backed up to a pile of plywood. There were several sheets of plywood in the van and he located a receipt on the driver's side floorboard with the name Alberto Gonzalez written on it. Silva also observed several unique footprints going from the white van to the plywood area. Silva called the reporting party by cell phone who told Silva they saw two vehicles; a gold colored Crown Victoria and a white van pull up to the location. The reporting party saw a person exit the gold vehicle, cut the lock, and open the gate; the person in the white van backed the van onto the property. Silva then spoke with the reporting party in person, who pointed out the vehicle they saw earlier in the evening driving past, saying, "There is those sons of bitches right there."

8.

When the vehicle came back around near the construction site, Silva and his partner made a traffic stop on the vehicle. Gonzalez was driving, and appellant, along with another individual, were passengers in the vehicle. They were sweating profusely and appeared to be nervous. Silva asked to look at appellant and the other individuals' shoes, and they were very similar to the unique prints at the scene. Silva's partner located a set of keys on Gonzalez's person, which they later determined opened the doors to the van and started the vehicle. As a result, Silva requested petty theft, trespassing, and felony conspiracy charges be filed against appellant. Silva recalled writing a probable cause declaration relating to the felony arrest for conspiracy. Silva arrested appellant and transported him to the central receiving facility and provided the probable cause declaration to the booking officers.

Following Silva's testimony, the court granted defense counsel's request to take judicial notice of the fact the charges filed against appellant by way of complaint, namely, sections 460, subdivision (b), 182, subdivision (a)(1), 6025, and 594, subdivision (b)(2)(A), were dismissed on June 19, 2012.

At the request of the prosecutor, and no objection from defense counsel, the court took judicial notice of the fact that the buccal swab was taken following a felony arrest on May 9, 2012, after appellant was booked into the central receiving facility.

The court denied defense counsel's request to find the DNA Act unconstitutional and denied appellant's motion to suppress.

### B.   *Analysis*

On appeal, appellant contends the introduction of evidence collected and retained under the DNA Act in this case violated appellant's California constitutional rights against unreasonable search and seizure and to privacy. Appellant argues his case presents a question left open by the California Supreme Court decision in *People v. Buza* (2018) 4 Cal.5th 658 (*Buza*).

9.

In *Buza*, the defendant had been convicted of refusing to provide a specimen as required by the DNA Act, a misdemeanor (§ 298.1, subd. (a)), and appealed his conviction. The *Buza* Court of Appeal reversed the defendant's conviction finding the collection requirement of the DNA Act as it applies to arrestees violated his rights against unreasonable search and seizure under the Fourth Amendment to the United States Constitution. (*Buza*, *supra*, 4 Cal.5th at p. 665.) While the case was pending on appeal, the United States Supreme Court addressed a similar statutory scheme in *King*, *supra*, 569 U.S. 435 and held "[w]hen officers make an arrest supported by probable cause to hold for a serious offense and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment." (*Id.* at pp. 465–466.) The case was returned to the *Buza* Court of Appeal who again reversed the appellant's conviction based on the finding that the DNA Act violates the California Constitution's prohibition on unreasonable searches and seizures. (*Buza*, at p. 665.)

On review, the Supreme Court held the DNA collection requirement was constitutionally valid as applied to an individual who is, quoting *King*, validly arrested on " 'probable cause to hold for a serious offense' " and required to swab his cheek as " 'part of a routine booking procedure' " at county jail under both the federal and state constitutions. (*Buza*, *supra*, 4 Cal.5th at p. 665.)

The Supreme Court reversed the Court of Appeal's judgment by a 4-3 vote. (*Buza*, *supra*, 4 Cal.5th at p. 665.) Justice Liu wrote a dissenting opinion, with Justices Cuéllar and Perluss concurring, and Justice Cuéllar wrote a separate dissenting opinion, with Justices Liu and Perluss concurring. Justice Liu concluded the defendant's conviction for refusing to comply with the DNA Act was invalid under the California Constitution and expressed no view on whether it was also invalid under the Fourth

10.

Amendment. (*Buza*, at p. 704.)[3] Justice Cuéllar concluded the DNA Act unlawfully invades an individual's reasonable expectation of privacy in their personal genetic information in violation of article I, section 1 of the California Constitution. (*Buza*, at pp. 726–727.)

Here, appellant does not argue he was not validly arrested for a serious offense nor that the collection of his DNA sample was not part of a routine booking procedure. Rather, appellant contends the DNA collection procedure under section 296 violates the California Constitution's guarantees against unreasonable search and seizure and to privacy as applied to individuals, like him, who are swabbed immediately after a felony arrest but whose charges are subsequently dismissed and whose sample is not subsequently sought to be expunged or actually expunged. Appellant contends this group was not addressed by the *Buza* majority[4] and relies heavily on comments from Justice

---

[3] On May 20, 2019, respondent requested we take judicial notice of the Attorney General's Crime in California 2016 Report and the Attorney General's Crime in California 2017 Report, as the report was referred to by Justice Liu in his *Buza* dissent. On May 24, 2019, this court ordered ruling on the request deferred pending consideration of this appeal.

On September 18, 2020, respondent filed a second request that we take judicial notice of the Attorney General's Crime in California 2018 Report and the California Department of Justice form JUS 8715/8715A—Information and Code Explanations.

Respondent's requests are hereby granted. (Evid. Code, §§ 452, 459.) We note, however, these documents have no effect on our disposition, as we did not reach the issue to which they pertain.

[4] The *Buza* majority "acknowledge[d the] defendant's concern about the collection of DNA samples from other individuals who are booked into custody but who ultimately will never be charged with a qualifying crime, or against whom qualifying charges will ultimately be dismissed." (*Buza*, *supra*, 4 Cal.5th at p. 679.) The *Buza* court noted voters had responded to that concern by providing for expungement of the DNA sample and associated records when the suspect is cleared of qualifying charges. Though the Maryland statute at issue in *King* had automatic destruction provisions, the *Buza* court noted the court in *King* attached no significance to these provisions in its constitutional analysis. (*Buza*, at pp. 679–680.) The *Buza* court also noted an arrestee's fingerprints, photographs, and other identifying information in law enforcement files generally have

Liu's and Justice Cuéllar's dissents regarding shortcomings of the DNA Act's expungement procedure, arguing the present case gives this court the opportunity to address the concerns of the dissenting justices. Appellant does not allege any violation of his Fourth Amendment rights.

Respondent argues appellant's argument is "dead at the outset" because appellant's challenge is to a ruling on a suppression motion, which is governed by Fourth Amendment search and seizure jurisprudence, not California law. We agree with respondent's contention that federal law applies to the issues appellant raises in the present case.

Generally, the California Constitution is a document of "independent force." (*People v. Brisendine* (1975) 13 Cal.3d 528, 549–550.) Prior to the adoption of Proposition 8, the Victim's Bill of Rights, California courts could interpret the California Constitution as entitling Californians to greater protection under the California Constitution against unreasonable searches and seizures than that required by the United States Constitution. (See *ibid*.)

Proposition 8, however, added article I, section 28 to the California Constitution. Relevant here is the "Right to Truth-in-Evidence" provision, which reads:

> "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, *relevant evidence shall not be*

---

not been thought to raise constitutional concerns even though the arrestee may later be exonerated. (*Id.* at pp. 680–681.) The *Buza* court, however, declined to decide whether the Fourth Amendment requires added protection for the "wrongly arrested or exonerated" and left the question for "another day, because defendant in this case is neither." (*Buza*, at p. 681.)

The United States District Court for the Northern District of California subsequently found the DNA Act's "inclusion of a somewhat more burdensome process for accomplishing" expungement than the Maryland statute at issue in *King* did not have any effect on its constitutionality as the court in *King* did not factor the expungement process into its analysis. (*Haskell v. Brown* (2018) 317 F.Supp.3d 1095, 1111.) The *Haskell* court found the DNA Act constitutional under *King*.

*excluded in any criminal proceeding*, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court. Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code Sections 352, 782 or 1103. Nothing in this section shall affect any existing statutory or constitutional right of the press." (Cal. Const, art. I, § 28, subd. (f)(2), italics added.)

In *In re Lance W.* (1985) 37 Cal.3d 873, 886–887, the California Supreme Court held that the right to truth-in-evidence provision of Proposition 8 eliminated a defendant's right to suppress evidence the seizure of which satisfied the Fourth Amendment but violated article I, section 13 of the California Constitution. Subsequently, the United States Supreme Court in *California v. Greenwood* (1988) 486 U.S. 35, 44 rejected the contention that Proposition 8's elimination of independent state grounds for the exclusion of evidence violates the due process clause of the Fourteenth Amendment. "[T]he people of California could permissibly conclude that the benefits of excluding relevant evidence of criminal activity do not outweigh the costs when the police conduct at issue does not violate federal law." (*California v. Greenwood*, at p. 45.) When the issue is whether seized evidence is properly admitted, the question is "exclusively" whether its suppression is required by the United States Constitution. (*People v. Glaser* (1995) 11 Cal.4th 354, 363.)

In response to respondent's argument that federal law exclusively applies, appellant writes in his reply brief that his arguments "should not be foreclosed by … California Constitution, article I, section 28," without explaining why, much less providing any authority to support this claim. Appellant states: "Respondent … argued that the only way that this issue can be addressed is based on the denial of his suppression motion. [Citation.] Appellant has argued that this court should address the issue of whether the evidence was improperly introduced and prejudicially affected the jury's decision-making. He asserts that this argument is not precluded under the California Constitution and is not a Fourth Amendment claim."

13.

Appellant's attempt to reframe his argument as anything other than one against the admission of the fruits of the collection of his DNA following his 2012 arrest does not make it so. As we have discussed, the "introduction" or admission of relevant evidence is governed by the right to truth-in-evidence provision. Appellant has not persuaded us that the proper standard to apply to his argument is not the federal standard. Accordingly, appellant's reliance on Justice Liu's and Justice Cuéllar's dissents in *Buza* is not persuasive because the *Buza* court was not considering the admission of evidence in a criminal case.

In other words, to address appellant's claims would be futile. Even if we were to conclude the DNA Act violated any of appellant's rights under the California Constitution, and we express no opinion here whether it does, we would not be able to provide any remedy. We cannot give appellant the remedy he seeks unless he can show the court erred by denying his suppression motion on Fourth Amendment grounds, which he does not attempt to do. (See *In re Lance W*., *supra*, 37 Cal.3d at pp. 886–887 ["The substantive scope of [section 13] remains unaffected by Proposition 8. What would have been an unlawful search or seizure in this state before the passage of that initiative would be unlawful today, and this is so even if it would pass muster under the federal Constitution. *What Proposition 8 does is to eliminate a judicially created remedy for violations of the search and seizure provisions of the federal or state Constitutions, through the exclusion of evidence so obtained, except to the extent that exclusion remains federally compelled*." (Italics added.)].) Because appellant makes no Fourth Amendment arguments and appears to concede exclusion was not compelled under federal law, we need not analyze his claim any further.

## II. Alleged Instructional Error

### A. *CALCRIM No. 373*

The jury was instructed with CALCRIM No. 373, as follows:

"The evidence shows that another person or other persons may have been involved in the commission of the crime charged against the defendant. There may be many reasons why someone who appears to have been involved might not be a co-defendant in this particular trial. You must not speculate about whether that other person has or those other persons have been or will be prosecuted. [¶] Your duty is to decide whether the defendant on trial here committed the crime charged."

Appellant contends the court erred by failing to make it clear to the jury the instruction did not apply to the testimony of Gonzalez or Guzman because, as he argues, it precluded the jury from considering why Gonzalez was not being tried when judging his credibility as well as Guzman's motivation to lie about appellant's involvement to avoid being prosecuted herself. Appellant contends the alleged error violated his Sixth and Fourteenth Amendment rights.

Respondent contends appellant has forfeited this claim by failing to object to the giving of CALCRIM No. 373 or requesting a modification. Appellant contends the issue is properly raised because the giving of the instruction in his case affected his substantial rights to a jury determination of the adequacy of proof required of the prosecution as Gonzalez and Guzman were central prosecution witnesses. In light of appellant's contentions that his substantial rights have been affected, we will address the merits of appellant's claim. It fails.

" ' "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." ' " (*People v. Smithey* (1999) 20 Cal.4th 936, 987.) Accordingly, "[i]n assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled." (*People v. Tate* (2010) 49 Cal.4th 635, 696; see *Estelle v. McGuire* (1991) 502 U.S. 62, 72.)

Appellant's argument is partially supported by the bench notes to CALCRIM No. 373, which read in pertinent part: "If other alleged participants in the crime are

testifying, this instruction should not be given or the bracketed portion should be given exempting the testimony of those witnesses." (Bench Notes to CALCRIM No. 373 (2020), p. 139.) The bracketed portion in the instruction reads: "[This instruction does not apply to the testimony of _____ *<insert names of testifying coparticipants>*.]" (CALCRIM No. 373.)

The next sentence in the bench notes, however, reads: "It is not error to give the first paragraph of this instruction if a reasonable juror would understand from all the instructions that evidence of criminal activity by a witness not being prosecuted in the current trial should be considered in assessing the witness's credibility." (Bench Notes to CALCRIM No. 373, *supra*, at p. 139.) To support this statement, the bench notes cite this court's decision in *People v. Fonseca* (2003) 105 Cal.App.4th 543, 549–550 (*Fonseca*).

In *Fonseca*, this court addressed the propriety of giving CALJIC No. 2.11.5 when coparticipants were testifying witnesses. The version of CALJIC No. 2.11.5 the *Fonseca* court addressed read:

> "There has been evidence in this case indicating that a person other than defendant was or may have been involved in the crime for which the defendant is on trial. [] There may be many reasons why that person is not here on trial. Therefore, do not *discuss or give any consideration* as to why the other person is not being prosecuted in this trial or whether [he] [she] has been or will be prosecuted. Your [sole] duty is to decide whether the People have proved the guilt of [each] [the] defendant on trial." (*Fonseca*, *supra*, 105 Cal.App.4th at p. 548.)

The *Fonseca* court noted the phrase "*discuss or give any consideration*" "is something short of optimal." (*Fonseca*, *supra*, 105 Cal.App.4th at p. 550.) The court went on to say, "We think [CALJIC No. 2.11.5] would get closer to the heart of the matter if, instead of the [words '*discuss or give any consideration*'], the phrases 'speculate upon' or 'guess at,' or words to that effect were substituted." (*Ibid.*)

16.

Even so, the *Fonseca* court held that the instruction at issue "sufficiently conveys the idea that the intent is only to prohibit idle speculation, not to prevent consideration of pertinent evidence." (*Fonseca*, *supra*, 105 Cal.App.4th at p. 550.) The *Fonseca* court held the giving of CALJIC No. 2.11.5 was not error when given in a trial where an unjoined coperpetrator testifies. (*Fonseca*, at p. 550.) Shortly after *Fonseca* was decided, the California Supreme Court came to the same conclusion, finding that giving CALJIC No. 2.11.5 was "not error when it is given together with other instructions that assist the jury in assessing the credibility of witnesses." (*People v. Crew* (2003) 31 Cal.4th 822, 845.)

Appellant's claim is not only precluded by *Crew*, as we explain, it is further weakened by the fact that CALCRIM No. 373 excludes the potentially problematic phrase this court in *Fonseca* pointed out as "short of optimal." By substituting the phrase "discuss or give any consideration" with "speculate about," as this court suggested would make the instruction clearer, there is even less of a possibility that the jury would read CALCRIM No. 373 as disallowing them from considering the full spectrum of factors in evaluating witness credibility. This substitution further underscores it is clear that "the intent [of the instruction] is only to prohibit idle speculation, not to prevent consideration of pertinent evidence." (*Fonseca*, *supra*, 105 Cal.App.4th at p. 550.)

Further, the jury was properly and thoroughly instructed on witness and accomplice testimony, which, under *Crew*, eliminates any potential of misuse of CALCRIM No. 373. The jury was instructed they could consider "*anything* that reasonably tends to prove or disprove the truth or accuracy of that testimony," including whether the testimony was influenced by bias or prejudice or a personal interest in how the case is decided, whether the witness made a statement inconsistent with his or her testimony, and whether the witness was promised immunity or leniency in exchange for his or her testimony. (CALCRIM No. 226, italics added.) The jury was also instructed that before they considered Gonzalez's and Guzman's testimony, they must decide

17.

whether Gonzalez and/or Guzman were accomplices to the crime. (CALCRIM No. 334.) They were instructed a person is an "accomplice" if they are subject to the prosecution for the identical crime charged against the defendant. The jury was further instructed that someone is subject to prosecution if he or she personally committed the crime or knew of the criminal purpose of the person who committed the crime and intended to and did in fact aid, facilitate, promote, encourage, or instigate the commission of the crime. The jury was instructed that if they determined Gonzalez and/or Guzman were not accomplices, the jury should evaluate their testimony as they would any other witness. They were instructed if they found Gonzalez and/or Guzman were accomplices, they could not rely on their testimony alone to convict appellant. Further, Gonzalez's immunity agreement was entered into evidence for the jury's consideration. The jury was also instructed that they must pay careful attention to all of the instructions and consider them together. (CALCRIM No. 200.)

While CALCRIM No. 373 is a general instruction that tells the jurors not to speculate as to why potential participants are not being prosecuted, the instructions on how to evaluate witness and accomplice testimony are specific. The specificity of the application of the witness and accomplice testimony instructions would have made clear to the jury they could consider Gonzalez's and Guzman's possible involvement with the crime on their credibility. It is unlikely that, after reading and considering the instructions together, the jurors would have understood CALCRIM No. 373 as instructing them to disregard elements of how to evaluate witness and accomplice testimony. We find the jury would have known, based on the totality of the instructions, they could consider why a witness was not being prosecuted in determining credibility.

For the foregoing reasons, we find no error in the court's instructing the jury with CALCRIM No. 373. Accordingly, we also find none of appellant's constitutional rights have been violated.

18.

### B.     The Court's Response to the Jury Question About Special Circumstances of Murder

While deliberating, the jury submitted a written question which read:  "If there is 1 special circumstance that is not unanimous[,] can there still be a 1st degree murder conviction[,] <u>or</u> do all 5 special circumstances need to be agreed upon for a murder 1 conviction"?

The court gave the jury a written response without objection that stated:  "If there is one special circumstance that is not unanimous, there can still be a first degree murder conviction.  Not all five enhancements need to be agreed upon for a first degree murder conviction.  [¶]  Please see CALCRIM instructions 520 and 521."

Appellant contends the jury's question demonstrated confusion about the order in which the jury should have made its findings.  He contends for this reason the trial court's response to the jury was incomplete and should have included a reference to CALCRIM No. 700,[5] which "made clear that the special circumstance allegations were only to be determined after they reached a unanimous verdict on first degree murder." Appellant contends the alleged error requires reversal under the Sixth and Fourteenth Amendments.

Respondent argues that because appellant did not object to the court's response below this issue is forfeited.  Appellant acknowledges he did not object below but

---

[5]     CALCRIM No. 700 reads:

"If you find the defendant guilty of first degree murder, you must also decide whether the People have proved that one or more of the special circumstances are true.

"The People have the burden of proving each special circumstance beyond a reasonable doubt.  If the People have not met this burden, you must find the special circumstance has not been proved.  You must return a verdict form stating true or not true for each special circumstance on which you all agree.

"In order for you to return a finding that a special circumstance is or is not true, all 12 of you must agree.

"You must consider each special circumstance separately."

contends we may review the error because of the substantive rights it implicates.  In the alternative, appellant contends his trial counsel provided ineffective assistance of counsel by failing to object.

Because appellant contends the alleged error affected his substantial right to a proper jury finding of every element of the offense and enhancements beyond a reasonable doubt, we decline to decide the issue based on forfeiture or ineffective assistance of counsel.  In any event, appellant's claim fails.

We apply "the abuse of discretion standard of review to any decision by a trial court to instruct, or not to instruct, in its exercise of its supervision over a deliberating jury." (*People v. Waidla* (2000) 22 Cal.4th 690, 745–746.)  "The court has a primary duty to help the jury understand the legal principles it is asked to apply." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)  During jury deliberations "when the jury 'desire[s] to be informed on any point of law arising in the case … the information required must be given.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 97.)  "However, '[w]here the original instructions are themselves full and complete, the court has discretion … to determine what additional explanations are sufficient to satisfy the jury's request for information.' " (*Ibid*.)

Here, it appears to us that the jury's question above all else demonstrated a confusion between first degree murder theories and special circumstances.  This is based on the jury's reference to there being "5 special circumstances" in their note.  The court's response began to correct this confusion by differentiating between terms; the court explained that if one "*special circumstance*" is not unanimous, there can still be a first degree murder conviction, but that not "all five *enhancements* need to be agreed upon for a first degree murder conviction." (Italics added.)  The court's referring the jury to CALCRIM Nos. 520 and 521 would have further alleviated this confusion.

By referring the jury to CALCRIM Nos. 520 and 521, the court reminded the jury of the elements that must be proven for first degree murder in contrast to second degree

20.

murder, underlining that agreement that a first degree murder theory had been proven was a requirement for a first degree murder conviction.  CALCRIM No. 520 explained the elements of murder.  CALCRIM No. 521 explained the elements set forth in CALCRIM No. 520 were for second degree murder.  CALCRIM No. 521 explained that appellant was being prosecuted for first degree murder on two theories:  deliberation and premeditation and lying in wait.  The jury was instructed they needed to unanimously agree appellant committed first degree murder but did not need to unanimously agree on the theory.  These two instructions would have underscored for the jury that they needed to decide on whether appellant committed murder and whether the murder was of the first degree by deciding whether the elements of a first degree murder theory had been proven.  The jury would have also understood from being pointed to these instructions that the elements of the special circumstances alleged were not elements of murder or first degree murder and could correctly infer they needed to be decided upon separately.

The court did not abuse its discretion by answering the jury's question in the manner it did; none of appellant's constitutional rights were violated.

## DISPOSITION

The judgment is affirmed.


DE SANTOS, J.

WE CONCUR:


PEÑA, Acting P.J.


MEEHAN, J.

21.